# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4102-23

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

F.J.R.,[1]

     Defendant-Appellant.

_____

Argued April 21, 2026 – Decided May 6, 2026

Before Judges Gilson, Perez Friscia, and Vinci.

On appeal from the Superior Court of New Jersey, Law Division, Sussex County, Indictment No. 23-03-0092.

Kevin S. Finckenauer, Assistant Deputy Public Defender, argued the cause for appellant (Jennifer N. Sellitti, Public Defender, attorney; Kevin S. Finckenauer, of counsel and on the briefs).

Shaina Brenner, Assistant Prosecutor, argued the cause for respondent (Daniel M. Perez, Sussex County

---

[1] We use initials to protect the privacy of the victim. See R. 1:38-3(c)(9), (12).

Prosecutor, attorney; Shaina Brenner, of counsel and on the brief).

PER CURIAM

After a jury trial, defendant F.J.R. appeals from convictions for two sexual assaults and criminal restraint. Defendant challenges the trial court's admission of fresh-complaint evidence, text messages, and allegedly incriminating statements of non-testifying witnesses. He also argues reversal is warranted because of the prosecutor's misconduct during summation and cumulative errors. Defendant further challenges the sentence imposed. Having reviewed the record, parties' arguments, and applicable law, we affirm.

I.

We recount the salient facts from the motion hearings and trial. Defendant and D.G. were divorced in 2020, and have a daughter, A.R. Following the divorce, D.G. had residential custody of A.R., and defendant was actively involved in A.R.'s life.

On August 17, 2022, D.G. went to the Hopatcong Police Department (HPD) and reported defendant had sexually assaulted her in May and August 2022. After an investigation, a Sussex County grand jury charged defendant with two counts of second-degree sexual assault, N.J.S.A. 2C:14-2(c)(1) (counts

one and two), and one count of third-degree criminal restraint, N.J.S.A. 2C:13-2(a) (count three).

## Motion Hearings.

On October 23, 2023, the State moved to admit D.G.'s verbal and text message fresh-complaint disclosures to her friends, A.C.-D. and H.A. The State also moved to admit the text messages D.G. had sent A.C.-D. and H.A. immediately before the August 15, 2022 assault. On November 29, 2023, the court conducted an N.J.R.E 104 hearing to determine the admissibility of the evidence, and the State presented testimony by A.C.-D. and H.A.

A.C.-D. testified she had been friends with D.G. for about thirty years and they were "like sisters." She recalled that in June 2022, while at D.G.'s house, D.G. disclosed that defendant in May 2022, had "touched . . . and tried to kiss her" after attempting to "get her intoxicated." A.C.-D. understood D.G. revealed defendant "sexually assaulted . . . her." At the time of D.G.'s disclosure, A.C.-D. observed D.G. "was distraught and traumatized."

A.C.-D. further testified that on August 15, 2022, she received a text message from D.G. at approximately 3:00 a.m. D.G.'s message stated, "Help. I hate my life. [Defendant] showed up drunk. I let him in because he was about to cause a scene and he is being crazy. So far[,] I have been able to keep him at

a distance. I locked myself in my room." After A.C.-D. read the text message at 6:00 a.m., she responded by text message and called D.G. A.C.-D. recalled D.G. was "crying when she answered the phone." D.G. told A.C.-D. defendant "assaulted [her] and raped [her]." A.C.-D. testified that D.G. disclosed defendant "pushed her down onto [her] couch in the living room and was yelling very loudly to their daughter, who was also crying, to get back in her room and close the door." D.G. told A.C.-D. she was going to report the sexual assault to the police.

H.A. testified to having a "close friend[ship]" with D.G. He recalled receiving "a text" message on August 15, 2022, at approximately 3:00 a.m. Because he was sleeping, he did not read D.G.'s text message stating "help" until about 8:00 a.m. After H.A. replied to D.G.'s message, she disclosed defendant had arrived at her house "drunk" and "attacked her." H.A. asked over text message if she meant "sex," and D.G. answered, "yes." H.A. then told D.G. to go to the police and verify her arrival by sending him a picture.

At the conclusion of the motion hearing, the court permitted the parties to submit further briefing on the admission of the August 15, 2022 text messages and the fresh-complaint statements regarding both alleged assaults. The State

4

represented it would provide defendant with a complete copy of D.G.'s text messages.

On January 4, 2024, after argument, the court found the State met its burden of demonstrating the admissibility of certain fresh-complaint disclosures by D.G. to A.C.-D. and H.A. The court limited admission of the State's fresh-complaint testimony to one of the proffered witnesses based on a finding of cumulativeness under N.J.R.E. 403. The court also preliminarily determined that all of the 3:00 a.m. text messages sent during the August 15, 2022 incident, but before the assault, were admissible as excited utterances and present sense impressions.

In addressing defendant's first fresh-complaint disclosure, the court found D.G.'s "disclosure of the May [2022] . . . alleged assault to" A.C.-D. "me[t] the requirements of the [f]resh[-c]omplaint [r]ule." The court reasoned "D.G. was approximately [thirty-five] years of age at the time of the disclosure," "A.C.-D. was a close friend of D.G.," "the conversation was initiated by D.G.," and A.C.-D. did not ask "leading questions or coerce[]" D.G. The court determined the first fresh-complaint testimony was relevant and "it should be left to the jury to assess whether [D.G.'s] delay in making the disclosure undermines [her] credibility."

A-4102-23

The court separately addressed the admissibility of D.G.'s 3:00 a.m. text messages and fresh-complaint disclosures to A.C.-D. and H.A. surrounding defendant's alleged second sexual assault on August 15, 2022. The court recognized it had to "parse" out D.G.'s proffered communications. It also found "[b]oth witnesses [were] . . . credible" based on their responses to questions.

Regarding the admissibility of D.G.'s 3:00 a.m. text messages before the August 15, 2022 assault occurred, the court preliminarily found the State established admissibility of the messages "on the basis of present sense impression," under N.J.R.E. 803(c)(1). It reasoned "D.G. messaged her two friends while . . . defendant [wa]s in her house and making unwanted advances towards her" and she "describ[ed] events . . . as they were occurring." Because D.G. had "originally reached out for help" and "the messages disclos[ed] . . . defendant's actions . . . during the incident," the court found the "conversations certainly were spontaneous" and "[t]here would also have been no opportunity for" A.C.-D. or H.A. "to coerce" D.G. "into creating a disclosure." Further, the court stated that the text messages were also admissible under the excited utterance hearsay exception, N.J.R.E. 803(c)(2), because D.G. "was under the stress of the excitement caused by the event or a condition and without opportunity to deliberate or fabricate." Regarding the spontaneity and relevance

6

of the text messages, the court determined D.G. sent them while defendant was "enter[ing] D.G.'s house or her room uninvited."

The court directed the parties "to [move] in limine" if they did not agree to any necessary redactions to D.G.'s text messages before the incident. It does not appear that either party moved to address redactions.

In addressing the State's offered fresh-complaint evidence as to the second assault, the court found the State met its burden regarding admissibility. However, the court reasoned "the information being offered" was duplicative and admitting "both [August 2022] statements . . . would be prejudicial to . . . defendant." It recited that the fresh-complaint rule serves to neutralize the sexist expectations of some jurors that women should immediately report "having been raped" but is not admissible "to prove the truth of the accusations." The court considered D.G.'s reporting "delay," that "neither disclosure w[as] so unique under the circumstances or so different[,]" and that there were insufficient reasons to permit the "cumulative admissibility of fresh complaint." Therefore, the court determined under N.J.R.E. 403 the prejudice from the admission of the witnesses' cumulative fresh-complaint evidence outweighed the State's arguments for admissibility of both. The State was directed to decide "which

A-4102-23

witness [it] shall use" and was required to "put defense counsel on notice so that [she] [could] adequately prepare."

Trial.

D.G. testified her relationship with defendant was "strictly business," related only to their daughter, and involved no "socializ[ing]" after their divorce. On May 7, 2022, the day before Mother's Day, D.G. recalled defendant planned to take her to dinner with their daughter, which she initially declined. She explained defendant had remarried but maintained his wife was "fine" with the dinner plan and A.R. had suggested it. However, because A.R. was sick, they agreed defendant would instead bring lunch, resulting in defendant bringing sushi and tequila to D.G.'s house.

D.G. recalled she and defendant were with their daughter in the living room and he gave D.G. multiple tequila drinks. After she indicated she wanted no more alcohol, defendant began bringing the tequila glass to D.G.'s mouth to drink more. She remembered he began "getting forceful," which caused her concern to switch to drinking water. Defendant made jokes of a sexual nature. After A.R. went to bed at 8:00 p.m., D.G. advised defendant "it was time for him to leave." Defendant willingly left the residence at about 9:00 p.m.

8

After A.R. fell asleep, D.G. "cleaned up" and "got ready for bed." At about 10:00 p.m., defendant returned. D.G. opened the door and defendant "bum rushed her" and started "kiss[ing]" her. D.G. described being about four feet eleven inches tall, and defendant as over five feet ten inches tall. As D.G. retreated to the hallway, defendant "kept trying to go for her neck . . . to kiss . . . and grab" her. While she attempted to push defendant away and told him to stop, she "ended up on the couch," after falling "into it." D.G. verbally told defendant to stop "two [to] four times."

D.G. recounted that defendant held down her "arms" to prevent her from "fight[ing] him off" and "pushed [her] down to . . . a laying position." She "could[ not] fight him off" and "went limp" because she was "hurting [her]self trying to fight him off." Defendant guided her to the bedroom, "took [her] bottoms off," took his "bottoms off," and "proceeded to rape" her. D.G. acknowledged not screaming or calling the police. When he finished, defendant took a shower. D.G. blamed herself, believing she "did this to [her]self." Afterward, she sent defendant a text message on August 8, 2022, stating, "I know you do[ not] respond to emotion, so I will keep it short, never again, and you need to get help." Defendant responded, "I understand and I am deeply sorry."

A-4102-23

D.G. recalled revealing to her girlfriend, A.C.-D., in June 2022 that an incident occurred with defendant in May 2022, insinuating he had assaulted her. Because A.R. was nearby, D.G. was "not overtly clear" while speaking with A.C.-D. D.G. remembered getting emotional and crying as she told A.C.-D.

D.G. also recounted that on August 14, 2022, defendant dropped A.R. off early from his parenting time because he had to take his wife to the airport. D.G. and A.R. went to the beach, returning home at 11:00 p.m. After they went to sleep, D.G. received a call at about 2:30 a.m. from defendant, stating he wanted to discuss an earlier conversation about A.R. D.G. asked defendant if he was driving, believing he "was drunk." He disregarded her question and the conversation ended. A short time later, defendant called again, telling D.G. to "open the door," and D.G. heard "[l]oud banging." D.G. warned defendant she would call the police because she "know[s] what [he] do[es.]" As she "was worried" he was driving while "drunk," D.G. "ignored [her] basic instinct" and let him in the home to sleep on the couch. Defendant's cell phone had recorded portions of the conversations, which D.G. and defendant agreed were accurate and played for the jury.

D.G. testified that while defendant was in her living room, she went to her "[bed]room and locked the door." She then heard defendant "jiggling the

doorknob." Realizing she was in "a bad situation," she grabbed her cell phone and "texted . . . friends for help." D.G. recalled defendant was "getting more aggressive at the door," began yelling, and said he would "break down the door." She believed by text messaging A.C.-D. and H.A. they would "call [her] and then [she] would be safe." D.G. believed defendant "might physically hurt [her] for trying to call for help."

The State moved into evidence D.G.'s text messages, which defense counsel "agree[d] with." Thereafter, the court inquired as to "any objection" to D.G.'s text messages, resulting in defense counsel representing there was not "necessarily . . . an objection."

D.G. further testified she was afraid for A.R. because defendant was loudly banging on her bedroom door. She opened the door, moved into the hallway "so [defendant] could[ not] bring [her] into [the] bedroom," and attempted to reason with him. After they sat in the kitchen, defendant grabbed D.G.'s forearms and restrained her. The commotion woke up A.R. After A.R. entered the kitchen area, defendant stopped, "threw himself back," and began "talking incoherently." He directed A.R. to "go to her room and then got more aggressive when she did[ not] listen." Worried for A.R., D.G. explained everything was okay and she should go back to bed. After A.R. returned to bed,

defendant led D.G. to the couch. At one point, D.G. recalled defendant tried to play music on his phone. He continued to grab and kiss D.G., exerting control over her. When D.G. stopped fighting, defendant "guided [her] to the bathroom." She relayed being unable to fight him off and feeling afraid for A.R.'s safety.

In the bathroom, D.G. described that "[h]e positioned [her] over the sink close to the toilet," causing the sink to "dig[] into [her] ribs." She testified defendant "lifted up [her night] dress and . . . proceed[ed] to rape her." Defendant grabbed her "pretty hard on [the] neck just to keep [her] in position," "expose[d] himself," and "penetrated her vagina with his penis." D.G. recalled "weeping" and "start[ing] . . . a very loud ugly cry."

During the incident, A.R. tried to find D.G. but defendant told her to "go away." Defendant later paused and laid down on the floor, attempting to position D.G. on top of him. She instead left the bathroom "shaking." D.G. recalled that when defendant "pulled out," "liquid came down [her] leg." Defendant followed D.G. to the couch and said, "I am sorry if I made you feel a certain way" and "left" the residence.

D.G. explained A.C.-D. later responded to her earlier text message at around 7:00 a.m. The State moved the text message exchange into evidence.

12

Defense counsel objected, noting the evidence of A.C.-D.'s messages to D.G. was "getting into hearsay." Given that A.C.-D. was set to testify to the messages, the court explained the communication was "subject to cross[-]examination." Defense counsel then "withdr[ew]" the objection. D.G. testified she spoke with A.C.-D. later in the morning and disclosed the sexual assault. D.G. also confirmed having a text message exchange with H.A.

D.G. recounted going to see a gynecologist on August 16, 2022, because she was worried about contracting sexually transmitted diseases. She told the doctor what occurred and a physical examination was completed. The parties stipulated the gynecologist's examination indicated "no evidence of trauma."

On August 17, 2022, D.G. went to HPD to report defendant's sexual assaults. HPD officers took D.G. to the hospital, where a sexual assault nurse examiner performed a "rape kit" examination and gave D.G. medication. The nurse observed "bruises on the back of [D.G.'s] neck."

After the examination, D.G. returned to HPD and attempted to communicate with defendant regarding the incidents. D.G. sent defendant multiple text messages, which caused him to call her. She did not answer defendant's phone calls but sent him text messages stating that she was "not doing well" and did not want A.R. to "see [her] crying." Defendant responded,

"I am sorry you are crying. Never my intent to see you cry." D.G. replied, "Why do you keep doing this? What am I doing wrong?" Defendant answered, "I will leave you alone."

On cross-examination, D.G. maintained she never consented to sexual intercourse with defendant, and he sexually assaulted her twice. D.G. conceded not immediately calling the police and disclosing the May 2022 assault until she told A.C.-D. a month after. D.G. also admitted visiting defendant's family during the summer of 2022, and they assisted her with "family care."

Regarding communications with defendant on the morning of August 14, 2022, D.G. identified text messages concerning A.R. and defense counsel moved them into evidence. D.G. acknowledged not going to the police immediately after the August 15, 2022 assault. Defense counsel questioned D.G. about obtaining a restraining order against defendant. D.G. confirmed she requested the restraining order to include that defendant was prohibited from visitation. Regarding D.G.'s attempts to elicit an admission from defendant while at HPD, D.G. admitted she was trying to "bait" defendant. She agreed defendant never admitted to assaulting her in the text messages and only stated that he was "sorry [he] made [her] cry."

A-4102-23

A.C.-D. testified about her long friendship with D.G. and that in June 2022, they discussed "what happened in May . . . 2022" with defendant. She recalled D.G.'s disclosure occurred at D.G.'s house, with A.R. in the vicinity. D.G. revealed defendant inappropriately touched, kissed, and tried to get her intoxicated even after she told him to stop.

Regarding the August 2022 incident, A.C.-D. stated she received "text messages from D.G." on August 15, 2022, at approximately 3:00 a.m. A.C.-D. recalled the first message stated, "help" and "I hate my life." A.C.-D. then read to the jury D.G.'s entire 3:48 a.m. text messages that stated, "Help, I hate my life. [Defendant] showed up drunk. I let him in because he was about to cause a scene and he is being crazy. So far[,] I have been able to keep him at a distance. I locked myself in my room."

After A.C.-D. received the messages, she responded at 6:46 a.m. stating, "Oh my God," "[y]ou should have called me," and "[s]is, I hope he[ is] gone now." D.G. answered, "Yeah, he got what he wanted. I am just going to l[ie] in bed and ignore life today" and "I know you love me so you might do something like stop by. Please do[ not]. I am tired. I just want to nap. We can talk later." A.C.-D. replied, "Okay, no problem, [s]is. Just get your rest." A.C.-D. also asked what D.G. meant by "[h]e got what he wanted" and inquired,

"Please tell me you did not open up your door last night and let him in your bedroom." After exchanging these text messages, D.G. and A.C.-D. spoke telephonically.

A.C.-D. testified that during their "twenty-minute" conversation, D.G. revealed:

> [defendant] came over really late at night, so early morning, and he sounded really drunk and he was really loud and [D.G.] was getting embarrassed about her neighbors, so she ended up opening the door for him. And she said after opening the door, she ran to her room and locked it so he could[ not] get in and he was just being really loud in the house and causing a scene and [she] eventually had to open it, open the door to her bedroom because she was worried about A[.R.] waking up from -- and scared, not knowing why her father was there yelling and screaming and acting different, different behavior. And from that point, she told me that he had ended up pushing her on the couch, started touching her inappropriately, while she was struggling and trying to ask him to get off. She said she was crying and [A.R.] started crying and tried to come out of her room and she said that [defendant] started yelling at A[.R.] to go back in her room and close the door angrily and continued to rape my best friend.

Defense counsel did not object.

After the phone conversation, D.G. sent an 11:40 a.m. text message to A.C.-D. stating, "I think I should file a police report or restraining order[] but

16

A-4102-23

do[ not] want [A.R.] there with me while I do it." A.C.-D. responded, "good idea."

After A.C.-D. testified about D.G.'s assault disclosures, the court provided the jury with the fresh-complaint charge. Defense counsel and the State agreed the charge should be given after A.C.-D.'s direct examination. The court's model jury charge instruction included that "[p]roof that a complaint was made is neither proof that the sexual offense occurred, nor proof that [D.G.] . . . is truthful. It merely dispels any negative inference that might arise from her assumed silence."

On cross-examination, A.C.-D. was asked about inconsistencies in her testimony. A.C.-D. asserted that she recalled more details about D.G.'s disclosures after testifying at the November 2023 hearing.

HPD Lieutenant James Bianculli testified that on August 17, 2022, he met D.G. when she reported defendant "sexually assaulted" her. After reporting the allegations, D.G. was taken to the hospital for a forensic examination and later returned to the HPD. Bianculli observed bruising on D.G.'s neck and photographed her injuries. D.G. provided HPD with her cell phone, allowing law enforcement to "go through" it. Bianculli explained that during the

17

investigation, in addition to interviewing D.G., other individuals were interviewed, including A.C.-D., H.A., and A.R.

When asked whether the information obtained from A.C.-D. and H.A. was "consistent with [his] investigation," Bianculli answered, "Yes." He explained a "member of the Prosecutor's Office" with "special training in interviewing juvenile witnesses" interviewed A.R. On cross-examination, Bianculli explained that if D.G. had other visible injuries, they would "have been photographed."

HPD Detective Rony Giordano testified to extracting information from D.G.'s and defendant's phones. He discovered defendant's cell phone data showed defendant "began navigating" to D.G.'s "address . . . at 2:29 a.m." on August 15, 2022, using the global positioning system application, "Waze." Giordano explained the "extraction report show[ed] [music application] activity" on defendant's phone at 4:15 a.m. on August 15, 2022, for "less than a minute."

After the State rested its case, defendant called his friend E.K., who testified to meeting defendant on the evening of August 14, 2022. They went to an Italian festival and multiple bars. They drank alcohol throughout the evening,

and E.K. believed defendant consumed about four drinks. Defendant was at a bar before meeting E.K.

On cross-examination, E.K. stated he was with defendant for about six hours and recalled they "sp[oke with] two females" at one bar. He asserted defendant was troubled about something, and they later separated after "last call" at approximately 1:30 a.m.

Defendant testified he began dating his current wife in January 2020. They married in March 2020, and had a son. He recalled friendly discussions with D.G. after their divorce, including discussion about her stay in a Pennsylvania rental property near his home, the purchase of a residence, an issue with a car tire, and a road rage incident.

Defendant remembered going to D.G.'s residence to celebrate Mother's Day with sushi and alcohol on May 7, 2022. He was adamant he "never forced [D.G.] to drink anything," asserting an adult cannot be forced. After A.R. went to sleep on May 7, 2022, he explained feeling "conflicted because [he] . . . [was] married" but was having fond memories of times with D.G. He left D.G.'s residence to buy his wife a gift but later returned to D.G.'s house because they had "agreed that [he] was going to come back."

Defendant recalled placing his arm around D.G. while watching "Netflix" on the couch and that they "looked at each other and . . . kissed." He said it "got hot," and D.G. took him to her bedroom, remarking "first time in my house, already in my bedroom." Defendant denied making "fresh jokes of a sexual nature," taking D.G.'s clothes off, and forcing sexual intercourse. After he asked permission to take a shower, D.G. agreed and "brought over a towel." Defendant recounted D.G.'s request for him to stay the night, but he explained having to "get back home to" his wife.

He acknowledged D.G. sent a text message stating, "I know you do [not] respond to emotion, so I will keep it short. Never again and you need to get help." He "understood" the text message to be referencing that he "cheat[ed]" on his wife. Defendant stated he apologized to D.G. and "felt bad[ly]" but "never forced [D.G.]" to have intercourse. Defendant highlighted that D.G. sent him text messages the same day about A.R., including that A.R. was "better than yesterday but [had] no voice. She is asleep. My apologies."

Regarding the August 15, 2022 alleged assault, defendant explained he had dropped off A.R. at D.G.'s house early in the morning on August 14, 2022, before driving his wife and son to the airport. D.G. later messaged defendant alleging A.R. was upset because she was excluded from defendant's family

projects. Defendant asserted D.G. "always made it extremely difficult for [him] to have a really good relationship with" A.R. and "accused" him "of abandoning" their family.

Defendant recalled meeting E.K. on August 14, 2022, going to a festival and bars together, and consuming about four "alcoholic beverages." After the evening ended, defendant called D.G. because her messages about A.R. bothered him and D.G. had "push[ed] his buttons." He admitted "plug[ging] . . . her address in his cell phone" and driving to her house.

Defendant maintained he arrived at D.G.'s house at about 3:00 a.m., knocked on the front door, and was invited in. They discussed A.R. and his relationship with his wife. Defendant remembered telling D.G. that his wife was "more of a mom than [D.G. was] to" A.R., resulting in D.G. becoming upset and locking herself in her bedroom. Once D.G. returned to speak with him, defendant recalled A.R. woke up and he told her to go back to bed, but D.G. directed A.R. to "go to mommy's room" and brought her there. After their conversation continued, defendant began "to cry" and "broke down, because the topic of being a good father came up again" and his father "[had] passed away." When D.G. began to cry, he "cupped her face" and they "kissed."

A-4102-23

Defendant told D.G. he "really want[ed]" her and she responded that she "wanted [him ]too, . . . [and that he had] five minutes." Because A.R. was in D.G.'s bedroom, they decided "to go into the bathroom." Defendant contended D.G. was facing the bathroom vanity and it got "really passionate" and "hot." He kissed her neck and was "right behind her" when "she put her right foot on the toilet" and "lean[ed] over," enabling him to "penetrate her." After a while, he "la[id] down" on the floor and she got "on top of" him. He maintained they finished about five minutes later, he fixed his pants, and she said "it[ was] late" and she had "to get to bed." After kissing her goodbye, defendant left.

Defendant remembered receiving D.G.'s text messages on August 17, 2022, and being confused by them. He described feeling badly, because he "cheat[ed] on [his] wife again," and believed D.G. must have felt "misled, thinking that [he] would get back with her."

On cross-examination, defendant admitted that on August 15, 2022, when he was out at the last bar with E.K., they spoke with two women. After the bar closed, he "started calling . . . women" to make plans, but multiple calls went unanswered. Defendant called a woman he saw that night, which was recorded at 1:44 a.m., and made "an effort to try to hang out with" her. After the woman declined to meet him, defendant put D.G.'s address into the "navigation on [his]

22

phone." He acknowledged during the entire evening he never sent D.G. a text message concerning A.R. After listening to his phone audio recordings, defendant admitted to knocking "on [D.G.'s] door," and that she said "no" three times. The recording memorialized her statement that she would call the police and defendant's response to "[g]o ahead, call them." When asked why he did not simply message D.G. about A.R., as opposed to going to D.G.'s house at 3:00 a.m., defendant responded he "should have."

Regarding the May 7, 2022 incident, on cross-examination, defendant maintained he and D.G. only drank "small amounts" of alcohol. He also believed D.G. "probably felt used" after having sexual intercourse that first time.

During summation, defense counsel argued defendant and D.G. had "consensual sex" and D.G. hoped they would "get[] back together" and "start . . . fixing the family unit." Defense counsel argued D.G. "harbor[ed] . . . feelings for" defendant, which were "romantic." Regarding the August 15, 2022 incident, defense counsel highlighted D.G.'s lack of "bruising . . . on her arms or her legs," despite her alleging defendant "pinned [her] down . . . so hard that she [could not] move."

Defense counsel argued the State failed to introduce testimony from anyone else "with any personal knowledge about what transpired on May 7[] or

23

August 15[, 2022] and that was" its burden.  In addition, defense counsel posited it was unclear D.G. ever said "no," and that "[w]hen pushed for specifics, . . . [D.G.] used the word 'probably.'"  Further, she referenced clichés made during her opening statement, including "number one, [h]ell hath no fury like a woman scorned" and "number two, [r]evenge is a dish that[ i]s served cold."  Defense counsel argued the State offered "red herrings" "to distract from the actual issue in the case, which [was] consent."

The prosecutor began his summation by directly addressing defense counsel's argued "clichés."  He asserted clichés are "convenient" and "lazy . . . because they are not based on facts or evidence."  In addressing whether D.G. fit within the cliché that "[h]ell hath no fury," the prosecutor argued the jury's decision must be based on the evidence presented.  In response to defense counsel's argument that D.G. failed to "put on a pair of underwear" beneath her nightgown on August 15, 2022, the prosecutor conceded that, while it was true D.G. did not wear "underclothes" to bed, "victims of sexual assault are not responsible for the assault."  He further stated, "do[ not] take the lazy way out," but "[c]onsider the evidence for what it is."  In addressing D.G.'s admissions that she did not scream, stopped "fighting," was in a "daze," and could not "remember every" detail, the prosecutor requested the jury to "use . . . common

24

sense" in examining all the testimony and evidence at trial. To rebut defendant's consent argument, the prosecutor highlighted there was not one message from D.G. asking defendant to "hang out" or that she "want[ed] him back."

In further addressing the issue of consent, the prosecutor stated, "the important thing is [whether] a reasonable person believed they had the consent to engage in that act." In responding to the suggestion that D.G. could not recall saying "no" to defendant, the prosecutor referenced D.G.'s testimony that she said "no" at least twice. He highlighted that the court provided "the charge on sexual assault" and suggested the jury take "notice that clothing is not mentioned once" in the charge nor is the "number of times someone says no or how they say no." In conclusion, the prosecutor stated, "I ask you that when you get . . . the law, that you review the evidence in its entirety" and "hold . . . defendant accountable for his actions. Hold him responsible for what he did to [D.G.] on May 7[], the eve of Mother's Day and August 15," 2022.

On April 23, 2024, the jury found defendant guilty of all three counts.

<u>Sentencing</u>.

On July 11, 2024, the court sentenced defendant. In addition to the counsel's arguments, the court considered defendant's: letters from family and

friends, work history, lack of criminal history, and the Avenel Adult Diagnostic and Treatment Center evaluation report (Avenel report).

The court initially noted defendant had the absolute right "to maintain [his] innocence." However, the court addressed that defendant made a misstatement in the Avenel report that he "may not have been appropriately represented" because he was unaware of his potential sentencing exposure if convicted. The court recalled addressing defendant's sentencing exposure when he declined the State's plea offer. Further, the court observed defendant failed to "grasp the evidence that was presented to [the court] and to the jury," noting he acted on August 15, 2022, with "no care whether law enforcement showed up to the house."

The court applied aggravating factor nine, N.J.S.A. 2C:44-1(a)(9) (need to deter). It found there was a need to deter defendant and recited specific evidence at trial, noting his testimony was "unbelievable." The court further found aggravating factor fifteen, N.J.S.A. 2C:44-1(a)(15) (the offense involved an act of domestic violence and defendant committed at least one act of domestic violence on more than one occasion), as to count two only. It explained aggravating fifteen applied because "[t]he events involved an act of domestic violence" and the factor would only apply to the second sexual assault

26

committed, which was the second act of domestic violence. The court declined to apply aggravating factor three, N.J.S.A. 2C:44-1(a)(3) (risk of reoffending), after considering defendant had "no prior criminal history" and the "totality of the circumstances." Additionally, the court declined to find aggravating factor fourteen, N.J.S.A. 2C:44-1(a)(14) (the offense involved an act of domestic violence committed in the presence of a child under sixteen years of age), because A.R.'s presence on August 15, 2022, was limited.

Regarding the mitigating factors, the court applied factor seven, N.J.S.A. 2C:44-1(b)(7) (lack of criminal history), based on defendant's lack of criminal convictions. It found mitigating factor nine, N.J.S.A. 2C:44-1(b)(9) (defendant's character and attitude indicate he is unlikely to commit another offense), because defendant had "been supportive to his family," demonstrating he was unlikely to commit another offense. The court declined, however, to apply mitigating factor eight, N.J.S.A. 2C:44-1(b)(8) (defendant's conduct was the result of circumstances unlikely to recur), finding defendant's conviction for two sexual assaults did not show the circumstances were unlikely to recur. The court also declined to apply mitigating factor eleven, N.J.S.A. 2C:44-1(b)(11), (defendant's imprisonment would entail excessive hardship to himself or his dependents), because there was no "unique or excessive hardship . . . [for]

defendant." In balancing the applied factors, the court determined the aggravating and mitigating factors were in equipoise.

In determining whether to order consecutive sentences, the court addressed the factors set forth in State v. Yarbough, 100 N.J. 627, 644 (1985). The court thoroughly reviewed the factors in ordering consecutive sentences on counts one and two. The court merged count three into count two. It explained there "can be no free crimes in a system for which the punishment shall fit the crime" and defendant had committed "two separate and distinct acts of sexual assault . . . months apart." The court reasoned "[t]he crimes [against D.G.] certainly were independent of each other" and there were "distinct circumstances surrounding the acts and violence." It sentenced defendant to an aggregate twelve-year term of imprisonment. Defendant's twelve-year term of imprisonment was subject to the No Early Release Act, N.J.S.A. 2C:43-7.2, and defendant was ordered to comply with Megan's Law, N.J.S.A. 2C:7-2, and parole supervision for life, N.J.S.A. 2C:43-6.4.

On appeal, defendant raised the following points:

POINT I

THE STATE ELICITED SIGNIFICANTLY DETAILED RETELLINGS OF THE VICTIM'S ALLEGATIONS IN VIOLATION OF THE FRESH-COMPLAINT DOCTRINE, IMPROPERLY

ELICITED CUMULATIVE FRESH-COMPLAINT TESTIMONY IN VIOLATION OF THE TRIAL JUDGE'S ORDER, AND ERRONEOUSLY INTRODUCED INADMISSIBLE TEXT MESSAGES INTO EVIDENCE

A. Fresh complaint is a limited exception to the rule against hearsay that allows admission of only the fact of a complaint.

B. The pretrial fresh-complaint hearings.

C. The fresh-complaint testimony at the trial.

D. Both D.G.'s testimony and [A.C.-D.'s] testimony contained detailed fresh-complaint discussion that went far beyond what is permitted under the rules and which improperly holstered D.G.'s narrative.

E. The State elicited cumulative fresh-complaint testimony that had been precluded by the motion judge.

F. The State admitted numerous inadmissible text messages that again served to improperly bolster D.G.'s testimony.

POINT II

LIEUTENANT BIANCULLI IMPROPERLY REFERENCED INCRIMINATING STATEMENTS FROM WITNESSES WHO DID NOT TESTIFY AT THE TRIAL, IN VIOLATION OF CONFRONTATION RIGHTS AND BRANCH/BANKSTON PRINCIPLES, AND IMPROPERLY TESTIFIED THAT THOSE

29

WITNESSES' STATEMENTS WERE CONSISTENT WITH D.G.'S VERSION OF EVENTS.

POINT III

THE PROSECUTOR COMMITTED MISCONDUCT BY DEMEANING THE DEFENSE'S ARGUMENTS AS "LAZY[,]" "CLICHÉS[,]" AND "RED HERRINGS," URGING THE JURY TO HOLD THE DEFENDANT "ACCOUNTABLE," AND MISREPRESENTING THE LAW OF CONSENT IN SUMMATION.

POINT IV

THE CUMULATIVE IMPACT OF THE ERRORS DESCRIBED IN POINT I, II, AND III DENIED [DEFENDANT] DUE PROCESS AND A FAIR TRIAL.

POINT V

THE SENTENCING COURT IMPROPERLY USED [DEFENDANT'S] ASSERTIONS OF INNOCENCE AS AN AGGRAVATING FACTOR AT SENTENCING, IMPROPERLY OVEREMPHASIZED THE "NO FREE CRIMES" PRONG OF THE YARBOUGH ANALYSIS, AND IMPROPERLY GAVE A LENGTHY STATEMENT EFFUSIVELY PRAISING THE VICTIM THAT UNDERMINED THE APPEARANCE OF IMPARTIALITY OF THE PROCEEDINGS.

A. The trial court improperly used [defendant's] assertions of innocence as an aggravating factor at sentencing.

30

B.    The trial court improperly relied almost exclusively on the "no free crimes" prong of the Yarbrough analysis in imposing consecutive sentences.

C.    The trial court undermined the appearance of impartiality by giving a lengthy statement praising both the victim and the jury's guilty verdict while denigrating [defendant].

II.

Defendant asserts multiple challenges to the court's evidentiary rulings. Appellate courts "typically review evidentiary rulings under a deferential standard and will 'uphold [the trial court's] determinations absent a showing of an abuse of discretion.'" State v. Trinidad, 241 N.J. 425, 448 (2020) (alteration in original) (quoting State v. Scott, 229 N.J. 469, 479 (2017)). We defer to the court's evidentiary rulings unless they were "so wide of the mark that a manifest denial of justice resulted." State v. Gonzalez, 249 N.J. 612, 633 (2022) (quoting State v. Singh, 245 N.J. 1, 13 (2021)). If we determine the court mistakenly exercised its discretion, "we must then determine whether any error found is harmless or requires reversal." Ibid. (quoting State v. Prall, 231 N.J. 567, 581 (2018)). We review a trial court's legal conclusions de novo. State v. Hubbard, 222 N.J. 249, 263 (2015).

III.

A.  Admissibility of the Text Messages.

We first address the court's admission of D.G.'s text messages to A.C.-D. and H.A. during the August 15, 2022 incident.  Defendant argues the totality of the text messages were "by and large inadmissible" and the court's "treatment of the text messages' admissibility is convoluted and . . . confusing."  He contends the unobjected-to "admission of the text messages" constitutes plain error and "requires reversal of his convictions."

As recognized by the court, D.G.'s text messages with A.C.-D. and H.A. must be reviewed separately under different hearsay exceptions.  The court correctly distinguished D.G.'s 3:00 a.m. text messages sent before the August 15, 2022 sexual assault from those sent hours after the assault.  The court granted the State's motion to admit D.G.'s 3:00 a.m. text messages sent to A.C.-D. and H.A., finding the State had established admissibility "on the basis of present sense impression" and "under the excited utterance hearsay exception."  While at the time of the motion the court reviewed all of D.G.'s 3:00 a.m. text messages, the court's decision noted she had not yet testified at trial.

Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the

32

matter asserted." State v. Medina, 242 N.J. 397, 421-22 (2020) (emphasis omitted) (quoting N.J.R.E. 801(c)).  "Hearsay is generally inadmissible 'except as provided by [the Rules of Evidence] or by other law.'" Prall, 231 N.J. at 585 (alteration in original) (quoting N.J.R.E. 802).  "Hearsay is generally inadmissible" under N.J.R.E. 802 "except if it falls within one of the hearsay exceptions." State v. Williams, 169 N.J. 349, 358 (2001).  "Statements that qualify as a present sense impression, N.J.R.E. 803(c)(1), or an excited utterance, N.J.R.E. 803(c)(2), are two such exceptions." State v. Outland, 458 N.J. Super. 357, 364 (App. Div. 2019).

The present sense impression hearsay exception under N.J.R.E. 803(c)(1) permits for the admission of a declarant's "statement describing or explaining an event or condition, made while or immediately after the declarant perceived it and without opportunity to deliberate or fabricate." "[T]he applicability of the exception turns on whether [the declarant's] comments . . . were made 'immediately after' the perceived event." State v. Rochat, 470 N.J. Super. 392, 453 (App. Div. 2022) (quoting N.J.R.E. 803(c)(1)).  In interpreting N.J.R.E. 803(c)(1)'s "immediately after" requirement, the Supreme Court has recognized that a delay of minutes between the event and a declarant's recounting of the

event may preclude a statement under the present sense impression exception. State ex rel. J.A., 195 N.J. 324, 339-40 (2008).

The excited utterance exception to the hearsay rule under N.J.R.E. 803(c)(2) permits the admission of a statement "relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition and without opportunity to deliberate or fabricate." The rationale for the excited utterance exception is that "excitement suspends the declarant's powers of reflection and fabrication, consequently minimizing the possibility that the utterance will be influenced by self-interest and therefore rendered unreliable." State v. Cotto, 182 N.J. 316, 328 (2005) (quoting State v. Long, 173 N.J. 138, 158 (2002)) (internal quotation marks omitted).

"In deciding whether there was an opportunity to fabricate or deliberate, a court should consider 'the element of time, the circumstances of the incident, the mental and physical condition of the declarant, and the nature of the utterance.'" Long, 173 N.J. at 159 (quoting State v. Williams, 106 N.J. Super. 170, 172 (App. Div. 1969)); see also State v. Branch, 182 N.J. 338, 366 (2005) (holding courts should consider "the time elapsed between that event and her statement, the continuing influence of the excitement caused by the [crime], the circumstances surrounding the taking of the statement, and whether the

34

statement was in response to questions").  Although each factor is important, "[t]he crucial element is the presence of a continuing state of excitement."  Cotto, 182 N.J. at 328 (alteration in original) (quoting State v. Lyle, 73 N.J. 403, 413 (1977)).  "[A] statement constitutes an excited utterance when 'the circumstances reasonably warrant the inference that the statement was made as an uncontrolled response to the shock of the event before reasoned reflection could have stimulated a self-serving response.'"  Ibid. (quoting Cestero v. Ferrara, 57 N.J. 497, 504 (1971)).

A party's "failure to 'object or otherwise preserve an issue for appeal at the trial court level' limits appellate review to a plain error inquiry."  State v. G.E.P., 243 N.J. 362, 389 (2020) (quoting State v. Santamaria, 236 N.J. 391, 404 (2019)).  Our Supreme Court has stated that "[p]lain error has intentionally been created as a high bar for parties to meet in order to encourage litigants to raise any objections to evidence at the trial level where the court can best 'forestall or correct a potential error,' in a timely manner."  Santamaria, 236 N.J. at 409 (quoting State v. Bueso, 225 N.J. 193, 203 (2016)).  "The mere possibility of an unjust result is not enough."  State v. Canfield, 470 N.J. Super. 234, 273 (App. Div. 2022).

At trial, D.G. and A.C.-D. testified that D.G.'s 3:46 a.m. text message to A.C.-D. requested help and briefly described the incident as it occurred. Further, D.G. testified to sending H.A. a 3:48 a.m. message stating, "help . . . I need help." After reviewing a copy of the text message, D.G. clarified she texted only, "Help." The court had previously ruled D.G.'s messages to "her two friends while . . . defendant [wa]s in her house and making unwanted advances towards her" were admissible under the hearsay exceptions because they "describ[ed] events . . . as they were occurring." Notably, defense counsel advised the court she "agree[d]" to the admission and had no "objection" when the State requested to move the exhibits into evidence.

After our review of the testimony and the court's findings, we are satisfied the court committed no error in admitting D.G.'s messages to A.C.-D. and H.A. asking for "help" as excited utterances because they were urgently made at the time of the event, and before D.G. had time to fabricate. Further, the remaining portions of the text messages sent to A.C.-D. before the assault were admissible as D.G.'s immediate present sense impression, describing the event as she was perceiving it. The court's finding that D.G.'s text messages sent during the event were "immediate" is amply supported by the record. For these reasons, we

discern no plain error in the court's admission of the text messages sent during the incident before the sexual assault.

## B. Fresh-Complaint Statements.

Defendant next contends reversal of his convictions is warranted because the State "elicited detailed retellings" of D.G.'s fresh-complaint disclosures through "multiple witnesses." He specifically asserts evidence of D.G.'s conversations with A.C.-D. and H.A. after the assault were admitted despite the court's order limiting fresh-complaint testimony to only one witness, resulting in D.G.'s testimony being improperly bolstered.

"Ordinarily, a third party's testimony about a victim's out-of-court description of an alleged sexual assault is inadmissible hearsay evidence." State v. C.W.H., 465 N.J. Super. 574, 599 (App. Div. 2021). "However, the fresh-complaint doctrine is a common law exception to this rule that 'allows witnesses in a criminal trial to testify to a victim's complaint of sexual assault.'" Ibid. (quoting State v. Hill, 121 N.J. 150, 151 (1990)).

The fresh-complaint doctrine's purpose is to permit "the admission of evidence of a victim's complaint of sexual abuse, otherwise inadmissible as hearsay, to negate the inference that the victim's initial silence or delay indicates that the charge is fabricated." Ibid. (quoting State v. R.K., 220 N.J. 444, 455

(2015)).  "[F]resh-complaint evidence serves a narrow purpose" of permitting "the State to negate the inference that the victim was not sexually assaulted because of [his or her] silence." Hill, 121 N.J. at 163.  "[T]o qualify as fresh-complaint evidence, the victim's statement must have been made spontaneously and voluntarily, within a reasonable time after the alleged assault, to a person the victim would ordinarily turn to for support." C.W.H., 465 N.J. Super. at 599 (alteration in original) (quoting R.K., 220 N.J. at 455).

D.G. and A.C.-D. testified about D.G.'s initial disclosure in June 2022 to A.C.-D. regarding the first sexual assault in May 2022.  D.G. testified she told A.C.-D. defendant "assaulted" her, but "did not use the word assaulted" and instead "insinuated . . . it."  A.C.-D. similarly testified D.G. disclosed that when defendant went "to her house during Mother's Day," he "started to touch [D.G.] inappropriately, tried to kiss her several times," and D.G. "kept pushing him away, and asked him to stop[,] and he also tried to push her to get intoxicated with alcohol that he brought."

After reviewing the first assault fresh-complaint testimony and the court's findings, we discern no reason to disturb the court's admission of the evidence.  A.C.-D. described D.G. as a "sister," and she was clearly a person that D.G. would turn to for support.  In fact, defense counsel acknowledged A.C.-D. was

38

"[o]bviously, . . . a childhood friend of D.G.'s, [and] they had known each other almost their entire lives."  A.C.-D. recalled that when they were at D.G.'s residence in June 2022, D.G. voluntarily and spontaneously revealed the first assault that occurred about a month earlier.  The court's admission of the fresh-complaint evidence regarding the first assault is sufficiently supported by the record.

We turn to address D.G.'s second fresh-complaint disclosure to A.C.-D. regarding the August 15, 2022 sexual assault in text messages and a subsequent cell phone conversation.  We note, as acknowledged in defendant's merits brief, at trial defendant raised the issue of admitting A.C.-D.'s responding text messages but "defense [counsel] withdrew the objection" to the admission of D.G.'s fresh complaint text messages to A.C.-D.  D.G. and A.C.-D. testified regarding the text messages and phone conversation.

D.G. recounted that at 6:46 a.m., A.C.-D. sent responding text messages stating, "Oh my God," "[y]ou should have called me," and "[s]is, I hope he[ is] gone now." D.G. text messaged back, "Yeah, he got what he wanted.  I am going to l[ie] in bed and ignore life today," and "I know you love me, so you might do something like stop by but please do [not].  I am tired.  I just want to nap.  We can talk later."

D.G. also telephonically disclosed to A.C.-D. that defendant had called her, "came over, created a scene," "tried to get into [her] room," "tried restraining [her]," was not "making any sense[,] and . . . was really drunk." D.G. stated that she "could[ not] fight him off," "gave up[,] and he assaulted" her. D.G. later messaged A.C.-D., "I think I should file a police report or restraining order[,] but [I] do[ not] want A[.R.] there with me while I do it." A.C.-D. responded it was "a good idea" and inquired, "how will that work? [Defendant] has to pick [A.R.] up for his weekends."

A.C.-D. similarly testified to responding to D.G.'s text message after waking up and reading "help." She recounted the text messages exchange. Regarding the phone conversation, A.C.-D. testified consistent with D.G.'s trial testimony. A.C.-D. further testified that D.G. stated defendant "ended up pushing her on the couch, started touching her inappropriately[] while she was struggling and trying to ask him to get off," "she was crying and [A.R.] started crying and tried to come out of her room[,] and . . . [defendant] started yelling at [A.R.] to go back in her room and close the door angrily and continued to rape [D.G.]"

In admitting D.G.'s and A.C.-D.'s testimony regarding the August 15, 2022 communications, the court thoroughly considered A.C.-D.'s and H.A.'s

"credible" fresh-complaint testimony at the evidentiary hearing and the parties' arguments. The court properly limited the testimony to one witness regarding D.G.'s August 15, 2022 disclosure, finding it would be duplicative and overly prejudicial to defendant if A.C.-D. and H.A. testified. Because fresh-complaint evidence cannot be used to bolster the victim's credibility, trial courts may "exclude cumulative fresh-complaint testimony that is prejudicial." Hill, 121 N.J. at 170.

After reviewing the record, we discern no error in the court's limited admission of the text messages between A.C.-D. and D.G. on August 15, 2022. The communications were voluntary, reasonable in time, and to a close friend. Defense counsel relied on the text messages between D.G. and A.C.-D. to argue in summation that D.G. lacked credibility by not notifying A.C.-D. sooner regarding the June 2022 assault. Further, we recognize the court's admission of fresh-complaint evidence should not be disturbed absent an abuse of discretion. State v. L.P., 352 N.J. Super. 369, 380-81 (App. Div. 2002) (citing Hill, 121 N.J. at 167-68).

Regarding A.C.-D.'s testimony concerning D.G.'s cell phone conversation disclosure, we recognize the better course would have been for the court to order further sanitization of the fresh-complaint evidence admitted. However, after a

41

review of the record and the admission, we conclude the admission was not "clearly capable of producing an unjust result." See R. 2:10-2. We also note the court properly instructed the jury with the model jury fresh-complaint charge.

Further, while defendant asserts the State "elicit[ed] fresh-complaint testimony as to . . . H.A.," the record demonstrates otherwise. D.G. testified that she texted H.A. at 3:46 a.m., before the sexual assault, "[s]omething like help" and "I need help. [Defendant] is here, or my ex is here." The text was not offered as fresh-complaint as it was before the sexual assault. As we have already concluded, the court appropriately admitted D.G.'s text message to H.A. as an excited utterance under N.J.R.E. 803(c)(2). Additionally, D.G. responded singularly, "Yes" to two questions asking if H.A. responded in the morning and if D.G. continued to message him. D.G. did not disclose the content of the messages, nor did she expound past answering, "Yes." These limited responses do not rise to the level of plain error.

## C. Lieutenant Bianculli's Testimony.

Defendant contends Bianculli improperly referenced incriminating statements from witnesses who did not testify, violating defendant's constitutional right to confrontation. The heart of defendant's argument is that

Bianculli testified to "interview[ing] several witnesses," including A.R. and H.A., who did not testify at trial, and that H.A. "made out-of-court statements that were 'consistent' with D.G.'s version of events." After our review of the testimony, we conclude the admission of Bianculli's testimony was not error.

The context of Bianculli's testimony is relevant to our review. The transcript reveals the State first asked Bianculli if interviews were conducted during the investigation. He responded, "We interviewed D[.G.]," "phone interview[ed] [A.C.-D. and H.A.]," and "an interview was also conducted with . . . [A.R.]" Bianculli further explained A.C.-D. and H.A.'s "phone" interviews were "documented" in his "investigation report." The State then asked, "based on the information that you received from . . . [A.C.-D. and H.A.], was the information provided consistent with your investigation thus far?" Bianculli answered, "Yes."

Bianculli then testified that "[a]n interview [of A.R.] was conducted with a member of the Prosecutor's Office who has [received] special training in interviewing juvenile witnesses and victims." There was no objection to the State from defendant. Additionally, no further testimony was elicited from Bianculli regarding H.A. or A.R. The parties also agreed the jury would be told the parties "stipulate[d] that during the early morning hours of August 15th,

43

2022, . . . [A.R.] woke up, came into the living room[,] and observed her father and mother present there. She did not observe any assault. At some point thereafter she returned to bed."

Our Supreme Court in State v. Bankston explained that when an "officer becomes more specific by repeating what some other person told him concerning a crime by the accused[,] the testimony violates the hearsay rule." 63 N.J. 263, 268 (1973); State v. Watson, 254 N.J. 558, 610 (2003). "Moreover, the admission of such testimony violates the accused's Sixth Amendment right to be confronted by witnesses against him." Bankston, 63 N.J. at 269. However, we recognize "there are circumstances in which an officer will be allowed to testify, based generally on hearsay evidence, to explain the course of his or her investigation." State v. Frisby, 174 N.J. 583, 592 (2002) (citing State v. Roach, 146 N.J. 208, 224-25 (1996)). When an officer provides reasons related to his or her actions in an investigation, the hearsay rule is not violated because the testimony is offered "to show 'the officer was not acting in an arbitrary manner or to explain his subsequent conduct.'" Medina, 242 N.J. at 413 (quoting Bankston, 63 N.J. at 268) ("[T]he hearsay rule is not violated when a police officer explains the reason he approached a suspect or went to the scene of the crime . . . .").

Reviewing the context of Bianculli's testimony demonstrates that the line of questioning pertained to "the investigative steps that [he] took . . . [r]elating to th[e] case." He did not reveal details regarding what H.A. or A.R. stated during their interviews. The question directed him to explain the next steps taken to interview A.R. Further, it is unclear from his testimony whether he even participated in A.R.'s interview conducted by the Prosecutor's Office. We are thus unpersuaded by defendant's assertion that Bianculli's "reference to the out-of-court statements unlawfully bolstered" D.G.'s version of events. For these reasons, we discern no plain error in Bianculli's lone answer, "Yes," to the State's question as to whether A.C.-D.'s and H.A.'s interviews were "consistent . . . thus far" in the investigation.

## D. Summation.

Defendant next argues the prosecutor committed misconduct in summation because he inappropriately "demean[ed] the role and arguments of defense counsel" by using the words "clichés," "red herrings," and "lazy." He further argues the prosecutor erred in asking the jury to hold defendant "accountable" and by "misrepresenting the law of consent." As there was no objection at trial, we review the prosecutor's comments in the overall context of the trial to examine if they constitute plain error.

45

Generally, "[p]rosecutors are afforded considerable leeway in closing arguments as long as their comments are reasonably related to the scope of the evidence presented." State v. Williams, 471 N.J. Super. 34, 43 (App. Div. 2022) (quoting State v. Frost, 158 N.J. 76, 82 (1999)). "A prosecutor must 'conscientiously and ethically undertak[e] the difficult task of maintaining the precarious balance between promoting justice and achieving a conviction,' ensuring that at all times [their] 'remarks and actions [are] consistent with [their] duty to ensure that justice is achieved.'" State v. Jackson, 211 N.J. 394, 408 (2012) (first and third alterations in original) (quoting State v. Williams, 113 N.J. 393, 447-48 (1988)).

Not every prosecutorial misstep requires a new trial. State v. Garcia, 245 N.J. 412, 436 (2021). "[P]rosecutors are expected to make '"vigorous and forceful" presentations during opening statements and summations.'" State v. Butler, ___ N.J. ___, ___ (2026) (slip op. at 18) (quoting State v. Williams, 244 N.J. 592, 607 (2021)). However, prosecutors "may not make comments that a jury must 'send a message' to the community and to the defendant." State v. Hawk, 327 N.J. Super. 276, 283 (App. Div. 2000) (quoting State v. Rose, 112 N.J. 454, 523 (1988)). "Only when the prosecutor's conduct in summation so 'substantially prejudice[s] the defendant's fundamental right to have the jury

fairly evaluate the merits of his defense' must a court reverse a conviction and grant a new trial." Ibid. (quoting State v. Bucanis, 26 N.J. 45, 56 (1958)). In other words, the prosecutor's conduct must be "so egregious that it deprived the defendant of a fair trial." Frost, 158 N.J. at 83.

Defendant asserts the prosecutor improperly referred to defense's arguments as based on clichés, red herrings, and lazy. However, the record demonstrates that defendant's contentions misconstrue the prosecutor's comments, taking the remarks out of context. The prosecutor directly responded to defense counsel's exact words and arguments, providing no "demeaning" statements. Relevantly, defense counsel's opening statement to the jury introduced D.G.'s motive to lie about having consensual sexual intercourse with defendant, referencing "proverbs or clich[é]s" because "they make sense." Defense counsel specifically stated the case was about "number one, [h]ell hath no fury like a woman scorned" and "number two, [r]evenge is a dish that[ i]s served cold." In summation, defense counsel then continued referencing "clich[é]s" and referred to the State's focus on specific facts as "red herrings."

After defense counsel's summation, the prosecutor addressed the argument using defense counsel's words and asserted that applying "clich[é]s" to the evaluation of the "facts [and] evidence" was "unoriginal," "convenient,"

and "lazy." The prosecutor emphasized the jury's "job is to base [its] findings on evidence" and "[n]ot assumptions." "A prosecutor is not forced to idly sit as a defense attorney attacks the credibility of the State's witnesses" and "is permitted" to respond. Hawk, 327 N.J. Super. at 284 (citing State v. C.H., 264 N.J. Super. 112, 135 (App. Div. 1993)). After reviewing the prosecutor's statements, we conclude his remarks were not "'clearly and unmistakably improper,' and [did not] substantially prejudice[] defendant's fundamental right to have a jury fairly evaluate the merits of his defense." State v. Smith, 167 N.J. 181-82 (2001) (quoting State v. Timmendequas, 161 N.J. 515, 575 (1999)). He fairly commented on defense counsel's arguments.

Defendant also argues the prosecutor misstated the law on consent by telling the jury not to consider D.G.'s actions during the incidents. He argues it was "completely legally erroneous" for the prosecutor to state the legal standard is not what a victim "does or does[ not] do to stop being sexually assaulted." We disagree with defendant's contention that the prosecutor advised the jury not "to evaluate the alleged victim's conduct."

The prosecutor's summation is replete with references to D.G.'s conduct that the jury was required to evaluate, including her choice not to scream, failure to immediately report the assaults to the police, and inability to remember

everything that occurred. Further, the prosecutor directed the jury's attention to the court's instruction on the law and suggested they "must decide whether . . . defendant['s] alleged act of penetration was undertaken in circumstances that led . . . defendant reasonably to believe that the victim had freely given affirmative permission" and that "affirmatively given permission means the victim did or said something which would lead a reasonable person to believe she was agreeing to engage in the act of sexual penetration." See Model Jury Charges (Criminal), "Sexual Assault (Force/Coercion) (N.J.S.A. 2C:14-2c(1))" (rev. Jan. 24, 2005). Relevantly, the court also carefully instructed the jury on the elements of sexual assault. A review of the prosecutor's summation discloses no error discouraging the jury from properly evaluating the evidence.

We are also unpersuaded by defendant's assertion that the prosecutor's request to the jury to hold defendant accountable warrants reversal. The prosecutor's remark regarding "accountability," was not "so egregious that [he] deprived the defendant of a fair trial." State v. McGuire, 419 N.J. Super. 88, 139 (App. Div. 2011) (quoting State v. Ramseur, 106 N.J. 123, 322 (1987)). Further, his remark does not rise to the level of an "inflammatory" statement that "convey[ed] a personal feeling of the prosecutor not supported by facts" nor did it "tell the jury that their job is to send a message to the defendant." Hawk, 327

N.J. Super. at 283. We are, therefore, convinced the remarks did not constitute plain error. State v. Feal, 194 N.J. 293, 312 (2008).

### E. Cumulative Error.

Defendant next posits that while one independent trial error alone may not warrant reversal, the cumulative effect of the errors deprived defendant of a fair trial.

"An appellate court may reverse a trial court's judgment if the cumulative effect of a series of errors is so great as to deprive a defendant of a fair trial." Butler, ___ N.J. at ___, (slip op. at 35-36) (quoting State v. Burney, 255 N.J. 1, 29 (2023)). "We do not focus our analysis on the number of mistakes but rather consider whether the errors together amount to an injustice." Id. at ___ (slip op. at 33). "If a defendant alleges multiple trial errors, the theory of cumulative error will still not apply where no error was prejudicial and the trial was fair." State v. T.J.M., 220 N.J. 220, 238 (2015) (quoting State v. Weaver, 219 N.J. 131, 155 (2014)). Based on our review of the record, we conclude defendant's arguments are "[in]sufficient to raise a reasonable doubt as to whether the error[s] led the jury to a result it otherwise might not have reached." State v. Macon, 57 N.J. 325, 336 (1971).

IV.

Defendant lastly challenges his sentence, contending the court erroneously used defendant's "claims of innocence as an aggravating factor to enhance his sentence" and "improperly overemphasized the 'no free crimes' factor" in ordering consecutive terms of imprisonment. He asserts the court "undermined the appearance of impartiality by giving a lengthy statement praising both [D.G.] . . . and the jury's guilty verdict while denigrating [defendant]." These contentions are unsupported by the record and without merit as the court's sentencing findings are amply supported.

An appellate court's standard of review of sentences is well-established and deferential. State v. Cuff, 239 N.J. 321, 347 (2019) (quoting State v. Fuentes, 217 N.J. 57, 70 (2014)). We will affirm a trial court's sentences unless: "(1) the sentencing guidelines were violated; (2) the findings of aggravating and mitigating factors were not 'based upon competent credible evidence in the record'; or (3) 'the application of the guidelines to the facts' of the case 'shock[s] the judicial conscience.'" State v. Bolvito, 217 N.J. 221, 228 (2014) (alteration in original) (quoting State v. Roth, 95 N.J. 334, 364-65 (1984)).

Once a sentencing court has balanced the aggravating and mitigating factors set forth in N.J.S.A. 2C:44-1(a) and (b), it "may impose a term within

the permissible range for the offense." State v. Morente-Dubon, 474 N.J. Super. 197, 208 (App. Div. 2022) (quoting State v. Bieniek, 200 N.J. 601, 608 (2010)); see also State v. Case, 220 N.J. 49, 65 (2014) (instructing appellate courts may not substitute their judgment for that of the sentencing court, provided that the "aggravating and mitigating factors are identified [and] supported by competent, credible evidence in the record").  When sentencing a defendant for multiple offenses, "such multiple sentences shall run concurrently or consecutively as the court determines at the time of sentence."  N.J.S.A. 2C:44-5(a).

In Yarbough, our Supreme Court established "general sentencing guidelines" that a court must consider when deciding whether to impose consecutive sentences.  100 N.J. at 643-44.  The Supreme Court explained that a sentencing court must evaluate whether:

> (1) there can be no free crimes in a system for which the punishment shall fit the crime;
>
> (2) the reasons for imposing either a consecutive or concurrent sentence should be separately stated in the sentencing decision;
>
> (3) some reasons to be considered by the sentencing court should include facts relating to the crimes, including whether or not:
>
> > (a) the crimes and their objectives were predominantly independent of each other;

(b) the crimes involved separate acts of violence or threats of violence;

(c) the crimes were committed at different times or separate places, rather than being committed so closely in time and place as to indicate a single period of aberrant behavior;

(d) any of the crimes involved multiple victims;

(e) the convictions for which the sentences are to be imposed are numerous;

(4) there should be no double counting of aggravating factors;

(5) successive terms for the same offense should not ordinarily be equal to the punishment for the first offense; . . . .

[Id. at 644.]

"The Yarbough factors are qualitative, not quantitative; applying them involves more than merely counting the factors favoring each alternative outcome." Cuff, 239 N.J. at 348 (citing State v. Molina, 168 N.J. 436, 442-43 (2001)); see State v. Carey, 168 N.J. 413, 427-28 (2001).

A "sentencing court must explain its decision to impose concurrent or consecutive sentences in a given case." Cuff, 239 N.J. at 348. "When a sentencing court properly evaluates the Yarbough factors in light of the record, the court's decision will not normally be disturbed on appeal." State v. Miller,

205 N.J. 109, 129 (2011). An explanation of the "overall fairness" is necessary "to 'foster[] consistency in . . . sentencing in that arbitrary or irrational sentencing can be curtailed and, if necessary, corrected through appellate review.'" State v. Torres, 246 N.J. 246, 272 (2021) (alterations in original) (quoting State v. Pierce, 188 N.J. 155, 166-67 (2006)).

At sentencing, the court cogently reviewed and applied the aggravating and mitigating factors. The sentencing transcript discloses that the court acknowledged defendant had maintained his innocence and the Avenel report documented defendant's asserted innocence. The court then addressed defendant's statements, emphasizing that he had the absolute right to maintain his innocence, but explaining it was well familiar with the evidence after presiding over the trial. The court thereafter focused on the jury's convictions for two separate sexual assaults and highlighted the specific trial evidence supporting those convictions. The record is bereft of any statement or inference showing the court applied an aggravating factor based on his claims of innocence or "penaliz[ed] him for maintaining his innocence."

The court sentenced defendant to two separate six-year terms of imprisonment on counts one and two after finding aggravating factors nine and fifteen, and mitigating factors seven and nine, were in equipoise. In determining

whether defendant should serve consecutive terms of imprisonment, which resulted in an aggregate twelve-year term, the court carefully and thoroughly considered the Yarbough factors.

In analyzing the Yarbough factors, the court found it relevant that defendant had perpetrated two separate sexual assaults against D.G. months apart. While noting there are "no free crimes," the court detailed defendant's independent sexual assaults and reasoned the facts "weighed heavily in the imposition of consecutive sentences." Relevantly, the court found "the damage that has been caused [to D.G.] by . . . defendant's . . . separate and distinct crimes" could not be "ignored." The court also recognized D.G.'s permanent and lasting emotional repercussions from the separate sexual assaults. Defendant's assertion that the court "belie[ved] it was required to impose consecutive sentences" is contradicted by the record. We discern no abuse of discretion by the court's ordering of consecutive sentences.

Finally, defendant argues the court "undermined the appearance of impartiality . . . by giving a lengthy statement praising [D.G.'s] . . . testimony." We disagree. The court's oral sentencing decision was approximately twenty-eight pages, including its statements addressing D.G. and A.R. that consisted of approximately two pages. In its statement to D.G., the court reflected it

A-4102-23

"certainly [had stated] . . . on numerous occasions, th[at] defendant ha[d] the right to maintain his innocence," but noted "[t]he jury did not see it that way." The court also explained it was declining to "address [the] parenting time [issue] upon . . . defendant's release." Regarding specific comments to D.G., the court "commended" her for proceeding and going to "therapy," expressing the "hope" that the conclusion of the proceeding "provide[d] some closure for [her] going forward." It also stated that "no one can question the strength and difficulty of the decisions that [D.G.] had to make to come forward."

Relevantly, the Crime Victim's Bill of Rights, N.J.S.A. 52:4B-34 to -38, was enacted by the Legislature to "give[] full recognition and protection" to "crime victims." N.J.S.A. 52:4B-35. The legislature "declare[d] that without the participation and cooperation of crime victims and witnesses, the criminal justice system would cease to function." N.J.S.A. 52:4B-35. Additionally, N.J.S.A. 52:4B-36(a) states that crime victims are "[t]o be treated with dignity and compassion by the criminal justice system." A review of the court's limited statements to D.G. demonstrates defendant's appearance of impropriety argument is without merit. The court appropriately addressed D.G. at sentencing after providing its sentencing findings.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division

A-4102-23